UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MEGAN SCHNEIDER, et al.,

        Plaintiffs,

       v.

CORNERSTONE PINTS, INC., et al.,

        Defendants.

No. 13 CV 4887

Judge Manish S. Shah

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs Megan Schneider, Dawn Phalen, Kelli Glasscock, Samantha Rodarte, Jason Dwyer, Tracy Martinez, Mike Heffley, Cheryl Hanes, Robert Brown, Melissa Gottschalk, and Tesa Emmart, filed this suit alleging violations of the Fair Labor Standards Act and the Illinois Minimum Wage Law.[1] Defendants Cornerstone Pints, Inc., and Jack Lewis have admitted liability for the alleged minimum wage and overtime violations. Defendants Michael Zdanowicz and Anthony Zdanowicz, by contrast, contest liability on the ground that neither was plaintiffs' "employer" under the FLSA or IMWL. Schneider, Lewis, and the Zdanowiczes testified at a bench trial. At issue was the Zdanowiczes' employer status, as well as whether defendants are entitled to a "tip credit."

After considering the documents and testimony admitted during the trial, and for the reasons explained below, I find in favor of defendants on the first question and

---

[1] Plaintiffs also brought a claim under the Illinois Wage Payment and Collection Act, on which defendants Michael Zdanowicz and Anthony Zdanowicz were granted summary judgment.

plaintiffs on the second question. This order sets forth my findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I.    Findings of Fact

Defendants Michael Zdanowicz and Anthony Zdanowicz (referred to as Mike and Tony throughout the trial) are brothers. Mike and Tony have owned and operated a metal brokerage company in Crown Point, Indiana—Z-Alloy Inc.—for almost 30 years. Before the events of this case, neither brother had any experience owning or operating a restaurant or bar.

Mike and Tony are married to two women who are sisters. These two sisters, in turn, have a sister who is married to defendant Jack Lewis. Lewis has worked in the bar and restaurant industry for over 30 years. He started as an assistant manager, worked his way up to assistant general manager, and eventually became a general manager. Along the way Lewis helped open several restaurants. He also spent time working as a general manager in college nightclubs. His final position before the events of this case was as the general manager of a Ruth's Chris Steak House in Columbia, South Carolina.

In 2007, Lewis proposed to Mike and Tony that the three open a restaurant. Mike and Tony were interested for two reasons. First, Z-Alloy's business was starting to plateau and Mike and Tony were looking for new avenues of investment. They saw opening a restaurant as one way to diversify their holdings and bring in more income. Second, Lewis and his family were the only members of his wife's family not

living in the northern Indiana area. Mike and Tony saw the opening of a restaurant—which Lewis would run—as a way to bring the entire family back together. From the beginning, the three men understood that Mike and Tony would fund the venture, and that Lewis—who had no capital but many years of experience—would run the restaurant's day-to-day operations.

Lewis proposed that they look into a franchise opportunity with the Canadian restaurant chain Firkin & Pheasant. The three went to Toronto to meet with the franchisor's principals. After Mike and Tony submitted applications and disclosed their finances, they were approved to open Firkin & Pheasant franchises in the Midwest. Mike, Tony, and Lewis went forward with opening the first location in Chicago.

Mike took the lead on setting up the company's framework. He hired lawyers to draft the organizational documents, he obtained insurance, he found a payroll service, and he hired a real estate agent to help them find a location. Tony participated in choosing the company's bank and its accounting firm. Lewis set up payroll after Mike put him in touch with the correct person. Although there was no direct evidence explicitly answering the question, I infer and conclude Lewis was the person who set the employee's rate of pay, because he was the one who set up payroll and only he had access to the point-of-sale system.

The new company, which was called Cornerstone Pints, Inc., was incorporated in Indiana and used Z-Alloy's street address as its business address. Mike, Tony, and

Lewis all participated in finding the location for the restaurant. Lewis led the decision to choose the space on Diversey Avenue in Chicago's Lincoln Park neighborhood, but Mike and Tony agreed with the choice. Mike and Tony signed and personally guaranteed the lease—Lewis did neither.

Mike, Tony, and Lewis each owned one third of Cornerstone. Tony became the corporation's president because he was the oldest. According to the bylaws, the president's duties included directing the policies and management of the corporation. Tony exercised his option under the bylaws, however, to delegate all presidential duties to Lewis. Mike was Cornerstone's secretary and treasurer. Lewis held no officer position, but he was named general manager for which—the three agreed—he would be paid $96,000 a year.

Mike and Tony each funded the corporation, allowing it to pay the initial $60,000 franchise fee to Firkin & Pheasant. These initial funds also covered payroll expenses until the restaurant started generating sales. At some point after the facility was in working order, people from Firkin & Pheasant came to Chicago to provide employee training. Of the owners, only Lewis participated.

Mike set up a repeating bank transfer that directly deposited funds into Lewis's account to pay for his work as general manager. On occasion, Mike would pay Jack through an account with Z-Alloy. Mike would also sometimes withhold amounts from Lewis's payments in order to service personal debts Lewis owed Mike. Lewis was given a credit card to use on behalf of the restaurant. The card was connected to

4

a Z-Alloy account. Lewis occasionally used the card for personal purposes, which Mike would then collect from Lewis.

Mike and Tony received daily sales reports from the restaurant that showed, among other things, summaries of the total labor cost for the day. Mike had Z-Alloy's administrative assistant enter information from the daily sales reports into the accounting software that Z-Alloy and Cornerstone shared. If a day went by and Mike did not receive a report, he would follow up with Lewis and ask why that was. Most days it was a restaurant employee (other than Lewis) who sent Mike the report. The employee would sometimes include a short narrative about how the day went or why the numbers were what they were.

Mike monitored certain Cornerstone financials, including the cost of rent, the cost of goods sold, vendor expenses, and the overall bottom line. Although bank statements for the restaurant were sent to Mike's office, he could not say that he ever "perused" them before forwarding them to the outside accountants, McMahon and Associates. Mike generated reports for the restaurant from the accounting software and sent them to the accountants, who then—also relying on reports from Lewis—generated financial statements for the company.

Mike, Tony, and Lewis had a budget that Lewis prepared before they opened the restaurant. This budget set a target of having labor costs equal 16% of sales. The restaurant never consistently hit that target. On several occasions, Mike communicated to Lewis that labor costs were too high (i.e., too far above 16%). As

Mike put it, he and Tony "were always concerned with expenses." For his part, Tony said he was "hyperfocused" on labor expense, because it was the metric Lewis had emphasized when pitching the idea. Mike would also ask Lewis what was going on with sales over certain periods of time, seeking to understand why they were either higher or lower.

The restaurant underwent a few renovations over its lifetime, including when the restaurant ended its franchise relationship with Firkin & Pheasant and was re-branded as Michael Diversey's. With each renovation, Lewis proposed the idea and Mike and Tony approved the special expenditure. During the change to Michael Diversey's, Mike talked on the phone with plaintiff Megan Schneider and the two discussed how the new interior should look.

Schneider testified that Lewis told her that when it came to any "major decision"—giving her a raise, paying her to put up seasonal decorations in the bar, running a new special, closing the restaurant on a holiday, or having patio seating—Lewis first had to talk with Mike and Tony. Schneider believed Lewis actually did run these issues by Mike and Tony because Lewis would come back and tell her that he had talked with Mike and Tony and that she could or could not do the thing requested. Schneider recounted the following example: "'Hey Jack, did you find out from Mike and Tony if we can close for Thanksgiving?' . . . 'I'm sorry, Megan, we have to be open this year.'" Schneider never directly talked to Mike and Tony herself about any of these issues. Lewis denied ever getting approval from Mike or Tony

about these various issues. He said he might have informed them, but it came down to him making the decision.

I find that Lewis did not need or obtain Mike's or Tony's approval for these decisions. He had the authority to make them on his own, and Mike and Tony expected him to do so. Whenever Lewis told Schneider he had to ask Mike and Tony, he was deflecting responsibility, but not truthfully. Lewis was not a strong manager. To him, invoking "Mike and Tony" was a way to defend against requests from the employees, while appearing to be a friend to the staff. I don't doubt Lewis ran many of these issues by Mike and Tony, but it was a matter of keeping his investors in the loop, not seeking permission.

Mike and Tony would occasionally go to the restaurant to eat, and while there they would speak with the employees—mostly small talk. Mike would also regularly call the restaurant asking for Lewis. If an employee such as Schneider answered the phone, Mike would ask how the day was, how the lunch shift went, when the rush was, the number of people that came in, how the specials were doing, and which events were coming up. Mike would ask Schneider if she worked the day shift, and, if not, who did. "Who is working tonight?" he'd ask. Mike and Schneider would also discuss the restaurant's Yelp reviews. When asked if Mike ever gave her an instruction during one of these phone calls, Schneider said the only thing that came to mind was that once when she told him they were "slammed," he responded: "[D]id you call in another server? Should you call in another server or you know, is Jack

7

there to help you?" This was not an instruction at all, but simply another example of an inquiry without direction. Mike did sometimes give Lewis instructions. For example, when the restaurant's operating bank account was low on funds, Mike would tell Lewis to make a deposit with money from the safe.

On occasion, Lewis would mention employee issues to Mike. For example, Lewis told Mike about an employee named Bruce who was causing problems. Mike at some point also learned that one of the employees was having his wages garnished, and Mike forwarded an email to Lewis to make sure the employee received relevant paperwork. Once, when a salaried employee left the restaurant, Mike had the employee removed from the company's insurance, per Lewis's request.

Mike and Tony would have informal weekly meetings about the restaurant. Mike would inform Tony of developments he learned from talking with Lewis. Lewis would advise Mike (and sometime Tony directly) of certain decisions he was considering—e.g., changing the menu or having certain specials—but I find that Lewis did not need Mike's or Tony's permission to do so. These decisions were within Lewis's lane of responsibility.

Mike received emails from Lewis on multiple occasions about how Lewis was correcting labor costs. Lewis would indicate that on a specific day, labor costs were actually some amount lower than originally reported. At least some portion of these adjustments consisted of Lewis illegally deleting employee hours, but there is no evidence Mike or Tony was aware the hours were being adjusted illegally. They

believed, based on what Lewis told them, that the changes were from employees forgetting to clock out, for example.

Whenever the restaurant was short on cash, Mike and Tony would make loans to it by depositing money into its bank account—the same account used to pay payroll. Mike and Tony each contributed over a million dollars to Cornerstone in the form of loans and other transfers over the course of its operation. Cornerstone lost an average of $200,000 a year. Mike and Tony put pressure on Lewis to turn things around, though this pressure primarily took the form of Mike complaining about low sales and high expenses. Schneider testified that Lewis would frequently express how concerned Mike and Tony were about cutting costs by, for example, getting rid of high overhead or cutting back on the menu. She described it as a "balancing act of pleasing . . . the money side and Mike and Tony and then pleasing the guests."

Mike and Lewis discussed the possibility of Lewis taking a new job while continuing to help with the restaurant for free. The restaurant would then hire a new general manager at a reduced salary. This never happened. The restaurant never made money, but Mike and Tony decided not to close it down because they had personal guarantees on the lease and they owed money on the equipment. When the original five-year lease was up, Mike was the one who negotiated a month-to-month arrangement at a lower price.

With business underperforming and pressure from his partners mounting, Lewis took to deleting employee hours from the system. This saved the company

money because it resulted in the employees not being paid for those hours. A comparison of clocked-in/out time and hours submitted by Lewis showed the hours illegally deleted by Lewis. At trial, Lewis claimed he did not realize deleting hours would actually hurt the employees, but this testimony was not credible. Lewis knew he was cutting employee pay by deleting hours (that was the whole point—to cut labor costs).

In addition to this intentional wage theft, the business also underpaid its employees by paying a tipped-employee rate (and tipped-employee overtime rate) that was lower than the rate required by law. At the time Lewis set the rates when the restaurant opened in January 2009, they were compliant with Illinois law (at $4.65 per hour), but Cornerstone did not keep up with changes in the state minimum wage law. In 2010, Cornerstone should have paid its tipped employees at least $4.80 per hour. And in 2011, it should have paid $4.95 per hour. But Cornerstone kept the rate at $4.65 per hour instead.

When the business was winding down, Mike was the one to sign the contract with the company that auctioned the equipment. The funds from the auction went to pay employees and taxes. Mike and Tony paid off the balance of Cornerstone's operating loan with the bank. After the lawsuit was filed, Mike and Tony had the hourly wages paid to the employees increased to the amount required where an accurate tip credit is also paid.

## II.    Conclusions of Law

### A.    "Employer"

The Fair Labor Standards Act defines "employer" broadly to include "any person acting directly or indirectly in the interest of an employer in relation to an employee . . . ." 29 U.S.C. § 203(d).[2] Consistent with this breadth, an employer can be either a company or an individual. *Id.* § 203(a). And a covered employee can have more than one employer at a time. *Falk v. Brennan*, 414 U.S. 190, 195 (1973). The FLSA's definition of "employer" is not without its limits, though. Perhaps owing to the liability that comes with the status, courts have stopped short of applying the definition precisely as written—at least when the defendant in question is an individual. Were they to do otherwise, every person with supervisory power over other employees would become liable for a company-employer's FLSA violations. *Donovan v. Agnew*, 712 F.2d 1509, 1510 (1st Cir. 1983). Even the lowest level supervisor would potentially be on the hook for substantial money damages, costs, and fees. No court—and neither party in this case—believes that is what Congress intended.

Some interpretative principles are universally accepted. First, all agree that to fulfill Congress's remedial intent, the term "employer" should be applied broadly. *Boucher v. Shaw*, 572 F.3d 1087, 1090 (9th Cir. 2009); *Dole v. Elliot Travel & Tours,*

---

[2] The parties—and other courts—agree that the "employer" analysis is the same under the FLSA and IMWL. [86] at 2 n. 2; [87] at 3; *see, e.g.*, *Villareal v. El Chile, Inc.*, 776 F.Supp.2d 778, 784 (N.D. Ill. 2011).

*Inc.*, 942 F.2d 962, 965 (6th Cir. 1991). But it's not exactly clear what that means, especially since no one thinks the term should be applied as broadly as written. The answer, it appears, is simply that the term "employer" under the FLSA is broader than how it is understood at common law.

The second commonly accepted rule is that formal or technical arrangements do not control the court's analysis. What matters instead are the actual facts on the ground (often called the "economic reality"). *Goldberg v. Whitaker House Cooperative, Inc.*, 366 U.S. 28, 33 (1961). In other words, it does not matter if parties have an agreement saying one is not an employer. If the practical facts show employment, then employment it is.

Third, all courts accept that the "employer" determination requires consideration of the totality of the circumstances, *see Rutherford Food Corp. v. McComb*, 331 U.S. 722, 730 (1947), though not everyone actually follows this rule.

Aside from these few common ground rules, courts from varying circuits have applied different methodologies for determining when a defendant is or is not an employer. For example, some courts consider the "economic reality" test to essentially consist of four specific factors: whether the defendant (1) possessed the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records. *See, e.g.*, *Orozco v. Plackis*, 757 F.3d 445, 448 (5th Cir. 2014); *Herman v. RSR Security Services Ltd.*, 172 F.3d 132,

12

139–40 (2d Cir. 1999).[3] Other courts, by contrast, have been guided by the principle that "a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Agnew*, 712 F.2d at 1511; *Elliott Travel*, 942 F.2d at 965. Still other courts have focused on whether an alleged employer's authority to control the conditions of employment was or was not actually exercised. *Patel v. Wargo*, 803 F.2d 632, 638 (11th Cir. 1986); *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1161 (11th Cir. 2008).

The Seventh Circuit has not specifically addressed the legal test or standard to apply in deciding if an individual defendant is an employer under the FLSA, but at least two of the court's decisions shed light on the issue. First, the Seventh Circuit stated (in dicta) that "[t]he word 'employer' is defined broadly enough in the Fair Labor Standards Act . . . to permit naming another employee rather than the employer as defendant, *provided the defendant had supervisory authority over the complaining employee and was responsible in whole or part for the alleged violation*." *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987) (emphasis added). Though nonbinding, this commentary shaped how several district courts within the circuit conducted the analysis. *See, e.g.*, *Arteaga v. Lynch*, 2012 WL 3879899, *11 (N.D. Ill.

---

[3] This bundle of four factors originated with the district court in *Bonnette v. California Health and Welfare Agency*, 525 F.Supp. 128, 135 (N.D. Cal. 1981). In that court's assessment of the then-existing legal landscape, these four factors constituted "the most commonly relied upon indicia" of "the existence of an employer-employee relationship under the FLSA." *Id*.

Sept. 6, 2012); *Harris v. Skokie Maid and Cleaning Service, Ltd.*, 2013 WL 3506149, *5 (N.D. Ill. July 11, 2013); *Driver v. AppleIllinois, LLC*, 2012 WL 4175010, *5 (N.D. Ill. Sept. 19, 2012).

Second, the Seventh Circuit can be read as having rejected rigid application of the four-factor version of the economic realities test featured in cases like *Orozco*, 757 F.3d 445. *See Moldenhauer v. Tazewell-Pekin Consolidated Communications Center*, 536 F.3d 640, 644 (7th Cir. 2008) ("[W]e decline to . . . limit our review [to these four factors] in this case or subsequent cases. Although these factors are certainly relevant in deciding whether an employer-employee relationship exists, it would be foolhardy to suggest that these are the only relevant factors, or even the most important."). Although *Moldenhauer* arose in the context of the Family Medical Leave Act, the decision itself suggests the standards for determining employer status are the same in the FMLA and FLSA contexts. *See id.* ("The joint-employer regulation in the FLSA mirrors that in the FMLA . . . and thus it makes sense for us to use this standard to govern the FMLA.")

Given this legal landscape, I conclude the most appropriate way to assess an individual's employer status under the FLSA is as follows. First, although a person must act in the interests of an employer in relation to an employee, more than supervision of an employee is required. Second, all relevant facts should be considered, including the four commonly bundled ones. These four factors, however, are neither dispositive nor necessarily weightier than any others. Third, to be an

employer, the defendant's conduct must have caused, in whole or in part, the alleged violation. While this particular factor is a necessary condition to liability, it alone is not sufficient. For example, if one employee were to somehow delete his co-worker's hours from the company's system, he would not thereby necessarily be an "employer," even though he caused the violation. Other factors would still have to be examined to see if he could be held liable under the FLSA. Fourth, and this follows from the previous point, the defendant must have actually exercised his authority, at least enough to have caused the violation in whole or in part. If a defendant does not exercise any authority, it cannot be that he is responsible for the violation.[4] Nor does it suffice for the defendant to have exercised some arbitrary authority (e.g., sign a few checks). The authority exercised must be related to the violation.

In sum, the test is to look at all facts surrounding the defendant's supervision of the employee and determine whether the defendant exercised control and authority over the employee in a manner that caused the FLSA violation (at least in part).

Plaintiffs phrased their proposed rule in a few different ways, but, at bottom, they would impose liability on all who control the corporation. Plaintiffs argue that "as long as someone has the ability to control the corporation's compliance with the

---

[4] Of course, one could imagine a scenario in which a manager fails to exercise his authority to remedy known FLSA violations as they occur. In such a situation, the manager might reasonably be deemed "responsible in whole or in part" for the violations. But, to maintain a meaningful limiting principle, such omissions or failures to act must occur under circumstances in which it is reasonable to infer an affirmative choice or action (relative to the FLSA violation) on the part of the defendant.

Act, they should be responsible." This is no limiting principle at all because it would include almost every owner, officer, and manager in a company. Signing up to run or own a company has never meant necessarily signing up for personal FLSA liability. Plaintiffs in this case are reasonably concerned that without liability against the Zdanowiczes, they will have no remedy because Cornerstone and Lewis are judgment proof. But the FLSA does not provide for liability against someone simply because they had some managerial or ownership connection with a now-defunct company and also have deep pockets. The statute does not guarantee that someone will be available to pay a judgment.

Plaintiffs argue for a standard that prompts "the person at the top to at least ask something of the manager to figure out if the organization is complying with the wage and hour laws." These incentives already exist. The owner's asset will lose value if her company is hit with an FLSA suit. Likewise, a manager running a company that is penalized for FLSA violations will have failed his duty to the ownership, and thus will likely face repercussions. In any event, the term "employer" defines a relationship, not a mechanism for FLSA enforcement.

Turning to the case at hand, neither Mike nor Tony was plaintiffs' employer under the FLSA. Neither brother caused the violations that took place. They did not know Lewis was deleting hours or that the wage was set below the legal minimum. Lewis, their partner, lied to them and kept them in the dark. Nor did Mike and Tony know enough about the restaurant business to suspect something might be amiss.

16

(Consider Tony's idea of turning the restaurant into a steakhouse, which was physically impossible.) When Mike and Tony finally learned of the violations, they acted immediately to fix them (in part, at least). They did not exercise authority that caused the violation.

Mike and Tony did not control the company's operations, whether considered day-to-day or big picture, and in particular, they did not control the work issues for the employees. They at most acted as sounding boards for Lewis and his ideas, and occasionally injected more money into the project. Lewis kept them abreast of what was going on because they were the money partners, he was the manager, and the business was failing. Mike and Tony applied general pressure on Lewis, but it was always consistent with that of investors complaining about losing money—not with management or control. Mike and Tony never hired or fired anyone, and it's an open question whether either one individually had the power to do so. Neither was responsible for such matters and neither had a majority vote. (The brothers are sued as individuals, after all.) Mike and Tony never supervised or controlled employee work schedules or conditions of employment. They did not determine the rate and method of payment. They did not maintain employment records. Tony was nominally the company's president, but the actual facts on the ground show he delegated this operational authority to Lewis. Mike set up the company and conducted the occasional administrative task at Lewis's request, but he primarily kept his hands off operations. Both brothers reviewed the daily sales reports, but their desire to see how

their investment was doing on a daily basis is not an appropriate ground to label them the waitstaffs' employer under the FLSA. Nor did immediately adjusting the wage rate make Mike or Tony liable. To the extent those actions took them across the line from non-employers to employers, all the alleged violations took place before the corrective action occurred, meaning they were not employers at the time in question.

Cornerstone Pints, Inc., and Jack Lewis are liable for the wage and hour violations and judgment will be entered against them, but the Zdanowiczes are not individually liable.

### B.  Tip Credit

Under the FLSA and the IMWL, an employer may offset its minimum wage obligation by tips its employee actually receives. *See* 29 U.S.C. § 203(m); 820 ILCS 105/4(a)(1), (c) (offset up to 40% of minimum wage). An employer may not take the federal tip credit, however, unless it informs the employee of § 203's tip credit provisions, which state:

> In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to—
>
> (1) the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on August 20, 1996; and
>
> (2) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in paragraph (1) and the wage in effect under section 206 (a)(1) of this title.

> The additional amount on account of tips may not exceed the value of the tips actually received by an employee. The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

*Id*. Plaintiffs say defendants did not sufficiently inform plaintiffs of § 203(m) and are therefore not entitled to the tip credit. Defendants disagree, noting an Illinois Department of Labor poster that hung in the restaurant. The poster read:

> **Minimum Wage & Overtime**
> . . .
> **Tipped Employees:** Must be paid at least 60% of the applicable minimum wage. If an employee's tips combined with the wages from the employer do not equal the minimum wage, the employer must make up the difference.

I agree this poster did not satisfy defendants' obligation to inform employees of the provisions of § 203(m). At the very least, the poster says nothing about § 203(m) requiring that "all tips received by such employee [be] retained by the employee . . . ." Accordingly, defendants Cornerstone and Lewis are not entitled to the tip credit under § 203(m). The damage that results is the difference between the then-applicable minimum wage and the amounts defendants did pay. On this point, defendants' pretrial submission and comments before trial suggest some confusion. Defendants appear to believe "minimum wage" refers to the 60%-of-minimum-wage figure. For that reason, defendants cite cases that hold "the employer is liable to tipped employees for the difference between the minimum wage and the wage paid to

19

tipped employees, regardless of the tips that tipped employees received." *Ventura v. Bebo Foods, Inc.*, 738 F.Supp.2d 8, 17 (D.D.C. 2010). But "minimum wage" means the full amount that a non-tipped employee would get. *See* 29 U.S.C. § 206(a); *see also Chung v. New Silver Palace Rest., Inc.*, 246 F.Supp.2d 220, 231 (S.D.N.Y. 2002) (holding defendant liable "for the difference between the full federal hourly wage as mandated by section 6(a)(1) of the FLSA . . . and the hourly wages actually paid to the plaintiffs for the hours they worked").

Next, defendants concede they did not pay the 60% of minimum wage required under Illinois law. Although no Illinois case has addressed what effect such a deficiency has on the availability of the IMWL tip credit, the language of the statute suggests this underpayment renders the credit unavailable. *See* 820 ILCS 105/4(c) ("The Director shall require each employer desiring an allowance for gratuities to provide substantial evidence that the amount claimed, which may not exceed 40% of the applicable minimum wage rate, was received by the employee in the period for which the claim of exemption is made, and no part thereof was returned to the employer.") Further, "Illinois courts have held that in the absence of Illinois decisions dealing with a particular labor law issue, federal decisions dealing with a substantially similar law, while not controlling, may be helpful and relevant." *See Bernardi v. Village of North Pekin*, 135 Ill.App.3d 589, 591 (3d Dist. 1985) (collecting cases). Accordingly, I conclude the tip credit is also unavailable under the IMWL.

20

## III.    Conclusion

Defendants Michael Zdanowicz and Anthony Zdanowicz were not "employers" under the FLSA or IMWL. Defendants Jack Lewis and Cornerstone Pints are not entitled to a tip credit under either the FLSA or IMWL, and the proper measure of damage is the difference between the full applicable minimum wage and the amount actually paid. Per their request at trial, defendants Jack Lewis and Cornerstone Pints are granted leave to submit a competing damages calculation by 12/15/15. A status hearing is set for 12/17/15 at 9:30am.

ENTER:

Date:    12/1/15

_____
Manish S. Shah
U.S. District Judge